**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ADAM WARD,  )<br><br>        Plaintiff,  )<br><br>    v.  )<br><br>LIBERTY MUTUAL INSURANCE<br>COMPANY,  )<br><br>        Defendant.  ) | Civil Action No.<br>24-10526-BEM |

**MEMORANDUM AND ORDER ON**
**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

**MURPHY, J.**

This is a putative class action in which Plaintiff Adam Ward alleges that Defendant Liberty

Mutual Insurance Company ("Liberty Mutual") sent telemarketing messages in violation of the

Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* (the "TCPA").  Before the Court

now is Ward's motion for class certification under Federal Rule of Civil Procedure 23.  For the

reasons set forth below, the Court will grant Ward's motion for class certification.

I.      **Background**

        A.      **The Telephone Consumer Protection Act**

"Congress enacted the TCPA to mitigate intrusive telemarketing practices."  *Mantha v.*

*QuoteWizard.com, LLC*, 347 F.R.D. 376, 382 (D. Mass. 2024).  To that end, the TCPA prohibits

the transmission of any call using a pre-recorded voice ("PVR") to a cellular or residential

telephone number without "prior express consent" of the called party.  47 U.S.C. § 227(b)(1)(A),

(B).  The Federal Communications Commission, under the authority delegated to it by Congress,

has clarified that for prerecorded telemarketing calls to a cell phone or landline, such consent must

be "written." 47 C.F.R. § 64.1200(a)(2). The TCPA also prohibits making telephone solicitations to an individual "who has registered his or her telephone number on the national do-not-call registry [("NDNCR" or "DNCR")]." *Id.* § 64.1200(c). These rules apply to both calls and text messages. *Id.* § 64.1200(e).

### B.    <u>Factual Background</u>

Liberty Mutual is a nationwide insurance company that conducts telemarketing campaigns using "leads"—contact information for potential customers—obtained from third-party aggregators, who themselves collect leads from different websites. Dkt. 49-21 at 24–26, 33; Dkt. 57-1 ¶ 8.[1] Liberty Mutual engages a third-party platform, Jornaya, to document its compliance with TCPA requirements by capturing video playback evidence of the consent provided by each consumer that Liberty contacts. Dkt. 57-1 ¶ 10.[2] Liberty Mutual purchased the leads at issue in this case from a "lead aggregator," All Web Leads, Inc. ("AWLI"). Dkt. 49-21 at 29, 40; Dkt. 49-8 ¶ 30. AWLI sourced these leads from Next Level Media, LLC. Dkt. 49-8 ¶ 35; Dkt. 49-18 at 2.[3] Between March 17, 2020, and June 12, 2020, Next Level Media sold 24,587 leads sourced from the website www.instant-auto-insurance-now.com (the "Lead Website") to AWLI. *Id.* at 38–39. These leads were compiled into a spreadsheet, *see generally* Dkt. 49-17 (the "AWLI Spreadsheet"),[4] which AWLI then sold to Liberty Mutual, Dkt. 49-8 ¶ 38. Thereafter, Liberty Mutual utilized the platform of its third-party vendor, Drips Holdings, LLC ("Drips"), to

---

[1] Dkt. 57-1 was filed under seal, *see* Dkt. 59 (granting motion to file exhibits under seal), because it "contains potentially 'confidential' information and proprietary information," Dkt. 58 at 1.

[2] *See supra* note 1.

[3] Dkt. 49-18 was filed under seal, *see* Dkt. 52 (granting motion to file exhibits under seal), because it "contains allegedly sensitive business information and was designated confidential by AWLI," Dkt. 48 at 2.

[4] The AWLI Spreadsheet was filed under seal, *see* Dkt. 52 (granting motion to file certain exhibits under seal), because it contains "proprietary and confidential information from AWLI . . . and . . . personal identifying information of putative class members," Dkt. 48 at 2.

place calls using pre-recorded messages and send text messages to consumers. Dkt. 49-21 at 125–26.

Ward registered his phone number on the NDNCR in 2005. Dkt. 49-3 at 2. From March 26, 2020, through March 30, 2020, Ward received six calls from Liberty Mutual, three of which utilized a PVR message, and one text message. Dkt. 49-2 ¶¶ 27–33; *see generally* Dkt. 49-4; Dkt. 49-5; Dkt. 49-6. Though Ward's phone number was submitted through the Lead Website to Liberty Mutual on March 26, 2020, Dkt. 49-9 at 4–5;[5] Dkt. 49-2 ¶¶ 44–45, Ward denies that he submitted the form on the Lead Website and denies having given express written consent or any consent for solicitation calls and texts from Liberty Mutual, Dkt. 49-2 ¶¶ 27, 49; Dkt. 57-4 at 180–88.[6]

### C.    Procedural History

On March 1, 2024, Ward brought this suit alleging that Liberty Mutual violated the TCPA by impermissibly placing calls utilizing a PRV and by placing calls and sending text messages to residential telephone numbers registered on the NDNCR.[7] Dkt. 1. Ward now seeks to certify two classes of similarly situated telemarketing recipients pursuant to Federal Rule of Civil Procedure 23. Dkt. 49; *see also* Dkt. 51 ("Mem."); Dkt. 57 ("Opp."); Dkt. 61 ("Reply"). Ward proposes two classes:

---

[5] Dkt. 49-9 was filed under seal, *see* Dkt. 52 (granting motion to file exhibits under seal), because it "certain proprietary information of Jornaya" and "has been designated confidential by Jornaya," Dkt. 48 at 1.

[6] Dkt. 57-4 was filed under seal, *see* Dkt. 59 (granting motion to file exhibits under seal), because it "contains [personally identifiable information] and other 'confidential' information," Dkt. 58 at 2.

[7] "[N]umbers on the NDNCR benefit from the presumption that [their] cellular phone number constitutes a residential telephone subscriber when that number is on the NDNCR." *Mantha*, 347 F.R.D. at 397 (cleaned up).

**PVR Class**: All persons in the United States or its territories (1) to whom Liberty Mutual placed, or caused to be placed, one or more call; (2) between March 1, 2020 to June 30, 2020; (3) to a number assigned to a cellular telephone service; (4) where Drips'[s] records indicate a prerecorded message played; and (5) the person's phone number appears on the AWLI Spreadsheet; and

**NDNC Class**: All persons in the United States or its territories who (1) received more than one call in a 12-month period; (2) by or on behalf of Liberty Mutual; (3) on a telephone number that appeared on the National Do Not Call Registry for at least 31 days at the time of the calls, (4) between March 1, 2020 and June 30, 2020; and (5) the person's phone number appears on the AWLI Spreadsheet.

*Id.* at 1 (footnote omitted). The Court heard oral arguments on June 4, 2026, and took the matter under advisement.

## II.    <u>Standard of Review</u>

Class actions serve as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–701 (1979)). A court may certify a class only if it finds that the proposed class satisfies all the requirements of Federal Rule of Civil Procedure 23(a) ("Rule 23(a)") and that class-wide adjudication is appropriate for one of the reasons set forth in Federal Rule of Civil Procedure 23(b) ("Rule 23(b)"). *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003). "Rule 23(a) requires that: (1) there be numerosity, (2) there be common questions of law or fact, (3) the class representative's claims be typical of the class, and (4) the representative's representation of the class be adequate." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 18 (1st Cir. 2008) (citing Fed. R. Civ. P. 23(a)). A plaintiff must also demonstrate the adequacy of counsel. *See* Fed. R. Civ. P. 23(a)(4), (g); *Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460–61 (1st Cir. 2009). Ward seeks certification under Rule 23(b)(3), which states that the court must find that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that a class action is superior to other methods for adjudicating the controversy. Fed. R. Civ. P. 23(b)(3).

For both Rule 23(a) and Rule 23(b), Ward must establish each of the elements "by a preponderance of evidence." *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) (quoting *Messnerv. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012)). Because "rigorous analysis" is necessary when testing a plaintiff's assertions, the Court may have to consider the merits. *Gonzalez v. XPO Last Mile, Inc.*, 579 F. Supp. 3d 252, 259 (D. Mass. 2022) (citations omitted). In doing so, the Court may "test disputed premises," *Tardiff v. Knox Cnty.*, 365 F.3d 1, 4 (1st Cir. 2004), and "formulate some prediction as to how specific issues will play out," *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000).

### III.    Discussion

#### A.    Rule 23(a)

##### 1.    Numerosity

To satisfy the numerosity requirement, a plaintiff must demonstrate that the class is so numerous that joinder would be "impracticable." Fed. R. Civ. P. 23(a)(1). While the requirement presents a "low threshold," *Garcia-Rubiera*, 570 F.3d at 460, "mere speculation as to the number of parties involved is not sufficient to satisfy Rule 23(a)(1)," *Swack v. Credit Suisse First Bos.*, 230 F.R.D. 250, 258 (D. Mass. 2005) (quoting 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1762 (3d ed. 2004)). A potential class exceeding 40 potential members is generally sufficient. *See Garcia-Rubiera*, 570 F.3d at 460.

Liberty Mutual does not dispute that Ward has met his burden as to numerosity, *see* Opp. at 16, and upon independent review, the Court agrees. Ward has identified over 20,000 potential PRV class members and over 7,000 potential NDNC class members. Mem. at 19. Based on this, the Court finds that the proposed class is sufficiently numerous as to make joinder of all members impracticable.

### 2.    **Commonality**

The commonality requirement is met when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy this requirement, a plaintiff must demonstrate that the proposed class's claims "depend upon a common contention," the resolution of which is "central to the validity" of each of the class's claims. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *see also Parent/Pro. Advoc. League v. City of Springfield*, 934 F.3d 13, 28–29 (1st Cir. 2019). The commonality requirement is a "low bar." *New Motor Vehicles*, 522 F.3d at 19. At bottom, "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart*, 564 U.S. at 349–50 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)).

Ward has identified several questions of law or fact that are common to the putative classes. *See* Mem. at 20–21. For example, whether the form on the Lead Website constitutes consent to be contacted by Liberty Mutual. *See id.* at 20; *see also Mantha*, 347 F.R.D. at 393 ("[A] '*single common legal or factual issue can suffice.*'" (emphasis in original) (quoting *Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 25 (D. Mass. 2003))). While Liberty Mutual argues that the question of consent is necessarily an individualized inquiry, it offers no support for this contention. *See* Opp. at 17–18. In contrast, other courts have determined that nearly identical questions regarding consent under the TCPA do suffice to meet the commonality requirement. *See, e.g.*, *Mantha*, 347 F.R.D. at 393 (rejecting a similar argument that issues of consent should defeat the commonality requirement and describing the challenge to the issue of consent as "in reality, [a] challenge[] to predominance").[8] Furthermore, the question of consent in this case turns on a

---

[8] The Court addresses more of Liberty Mutual's specific arguments regarding the individualized nature of the consent inquiry in its analysis of predominance. *See infra* Section III.B.1.

common form for all class members.  *See Thrower v. Citizens Disability, LLC*, 2022 WL 3754737, at *3 (D. Mass. Aug. 30, 2022) ("The plaintiffs' allegations raise multiple common issues, including whether the forms filled out by customers on lead generator websites conveyed consent to be contacted.").  The Court thus finds that Ward has satisfied the commonality requirement.

### 3.  **Typicality and Adequacy**

The typicality requirement mandates that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  Typicality does not require that all putative class members share identical claims or defenses.  *In re Credit Suisse-AOL Secs. Litig.*, 253 F.R.D. 17, 23 (D. Mass. 2008) (citing *Swack*, 230 F.R.D. at 260).  Instead, typicality is established if the claims of the class representative "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . are based upon the same legal theory."  *Garcia-Rubiera*, 570 F.3d at 460 (alterations in original) (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996)).  The "'requirement is not highly demanding' because 'the claims only need to share the same essential characteristics, and need not be identical.'"  *Payne*, 216 F.R.D. at 26 (quoting 5 *Moore's Federal Practice* § 23.24[4]).

Meanwhile, the adequacy requirement is met where the representative party will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  The adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  Adequacy is satisfied if (1) there is no conflict between the interest of the named plaintiffs and the class members and (2) counsel chosen by the named plaintiffs are qualified and able to litigate the claims vigorously.  *S. States Police Benevolent Ass'n v. First Choice Armor & Equip., Inc.*, 241 F.R.D. 85, 88 (D. Mass. 2007) (citing *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985)).  "[P]erfect symmetry of

interest is not required and not every discrepancy among the interests of class members renders a putative class action untenable." *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 138 (1st Cir. 2012). As with typicality, "unique defenses" may defeat adequacy. *Shanley v. Cadle*, 277 F.R.D. 63, 69 (D. Mass. 2011) (quoting *Credit Suisse*, 253 F.R.D. at 23); *see also Mantha*, 347 F.R.D. at 395 (noting that "the adequacy requirement 'tend[s] to merge' with the commonality and typicality requirements such that a court's analysis as to all three requirements will often overlap" (alteration in original) (quoting *Falcon*, 457 U.S. at 157 n.13)). Merely lacking identical interest, however, is not enough for a representative party to be found inadequate. *Murray v. Grocery Delivery E-Servs. USA Inc.*, 55 F.4th 340, 345–46 (1st Cir. 2022) (quoting *Cohen v. Brown Univ.*, 16 F.4th 935, 945 (1st Cir. 2021)); *see also Matamoros*, 699 F.3d at 138 (holding that only "fundamental" conflicts "that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement" (cleaned up)).

Ward argues that he has demonstrated typicality because his "claims and the class claims arise from [Liberty Mutual's] single course of conduct and are based on the same legal theories," and all claims turn on the same defense as to whether use of the Lead Website constitutes valid consent. Mem. at 21–22. He also contends that he is an adequate representative for the classes, pointing to a lack of conflicting interest with the other class members, his knowledge about the TCPA, and demonstrated commitment to the classes throughout the course of this litigation. *Id.* at 22–23. Liberty Mutual argues that Ward cannot satisfy typicality or adequacy because he "affirmatively contacted Liberty and expressed interest in its automobile insurance products," is a serial TCPA claimant, and that his "credibility will be a central issue at trial." Opp. at 19–23.

The Court finds that Ward satisfies both the typicality and adequacy requirements. "His injuries arose from the same course of conduct as the rest of the proposed [c]lass[es]: He received

8

multiple telemarketing texts from [Liberty Mutual] while his residential phone number was on the NDNCR" and seeks the same statutory relief.[9] *Mantha*, 347 F.R.D. at 393–94. Liberty Mutual provides no adequate explanation as to how Ward's history of TCPA claims would impact his credibility, representation, or claims in this case as to impact the interests of absent class members. *Compare Clough v. Revenue Frontier, LLC*, 2019 WL 2527300, at *5 (D.N.H. 2019) (holding that frequent prior TCPA litigation does not render a plaintiff inadequate and explaining that "[t]he general rule . . . is that attacks on a representative's credibility can render him inadequate only when they 'are so sharp as to jeopardize the interests of absent class members'" (quoting *Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 431 (6th Cir. 2012))), *with Johansen v. Bluegreen Vacations Unlimited, Inc.*, 2021 WL 4973593, at *4–5 (S.D. Fla. Sept. 30, 2021) (denying class certification where "[p]laintiff acknowledge[d] that he has developed a 'typical practice' of deceitful conduct used to succeed in prosecuting TCPA claims"). And, contrary to Liberty Mutual's argument that Ward "deliberately misled Liberty [Mutual] into believing he was a legitimate prospective customer, initiated contact under false pretenses, and secretly recorded the ensuing call for the purpose of manufacturing a TCPA claim," Opp. at 19, 21–22, Ward's calls placed *after* the challenged communications cannot demonstrate consent to those *prior* challenged communications. *See, e.g.*, *Clough*, 2019 WL 2527300, at *5 ("[T]hat [plaintiff] made misrepresentations when talking to . . . telemarketers after receiving the text message is not relevant to his contention that the defendants sent him the text message without his prior consent.").[10]

---

[9] *See supra* note 7.

[10] *See also Mantha v. QuoteWizard.com, LLC*, 2022 WL 325722, at *11 n.23 (D. Mass. Feb. 3, 2022) (explaining in a partial summary judgment decision that "[e]ven if true [that plaintiff consented because he responded after the eighth text message] for the communications [plaintiff] engaged in after the eighth message, this does not change the conclusion that there was no express consent for the eight messages sent prior to [plaintiff's] response").

Additionally, Liberty Mutual does not appear to contest, for the purposes of class certification, that Ward's counsel is qualified to serve as counsel for the purported class. *See generally* Opp. The Court concludes that the background and experience of Ward's attorneys, *see generally* Dkt. 49-8; Dkt. 49-32; Dkt. 49-37, suffice to qualify them as competent and adequate class counsel.[11]

### B.    Rule 23(b)(3)

Ward seeks to certify the class under Rule 23(b)(3). "To certify a class under Rule 23(b)(3), a judge must further find 'that the questions of law or fact common to class members predominate over any questions affecting only individual members' ('predominance'), and that 'a class action is superior to other available methods for fairly and efficiently adjudicating the controversy' ('superiority')." *New Motor Vehicles*, 522 F.3d at 18 (quoting Fed. R. Civ. P. 23(b)(3)). A court must take "a close look at the case before it is accepted as a class action." *Id.* (quoting *Amchem*, 521 U.S. at 615).

### 1.    Predominance

The predominance inquiry aims to "test whether any dissimilarity among the claims of class members can be dealt with in a manner that is not 'inefficient or unfair.'" *In re Asacol Antitrust Litig.*, 907 F.3d 42, 51 (1st Cir. 2018) (quoting *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013)). In conducting the predominance analysis, "a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Waste Mgmt. Holdings*, 208 F.3d at 298. While the "predominance" requirement is much more demanding than the Rule 23(a)

---

[11] The Court also finds that appointment of Ward's counsel as class counsel comports with the factors in Federal Rule of Civil Procedure 23(g). *See* Fed. R. Civ. P. 23(g)(1).

prerequisite of commonality, it does not require complete uniformity. *See Amchem*, 521 U.S. at 623–24. It "requires merely that common issues predominate, not that all issues be common to the class." *Smilow*, 323 F.3d at 39. As such, an action can still satisfy Rule 23(b)(3) "[w]hen 'one or more of the central issues . . . are common to the class and can be said to predominate . . . even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 7AA Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1778 (3d ed. 2005)).

The Court finds that Ward has sufficiently demonstrated that common issues predominate over individual issues. For the PRV class, Ward points to common evidence—including Drips's declaration, Dkt. 49-40 ¶¶ 7–14, 23, Drips's call records, *see generally* Dkt. 49-41 (call log);[12] Dkt. 49-43 (call log),[13] testimony from Ward's expert and electronic databases, *see* Dkt. 49-38 ¶¶ 21–31 (expert report of Aaron Woolfson, identifying evidence upon which his report is based on that includes electronic database resources); Dkt. 49-39 ¶¶ 9–28 (supplemental expert report of Mr. Woolfson)—to demonstrate the major aspects of the Class Definition, specifically that the class members received a "pre-recorded or artificial voice" call made to a cell phone. Mem. at 25. For the NDNC class, Ward similarly points to common evidence—including Drips's declaration, Dkt. 49-40 ¶¶ 7–11, 15–17, 23, the content of the calls and text messages themselves, *see generally*

---

[12] Dkt. 49-41 was filed under seal, *see* Dkt. 52 (granting motion to file exhibits under seal), because it "contain[s] certain proprietary details about Drips's business and has been designated confidential by Drips" and "feature putative class members' phone numbers," Dkt. 48 at 2.

[13] Dkt. 49-43 was filed under seal, *see* Dkt. 52 (granting motion to file exhibits under seal), because it "contain[s] certain proprietary details about Drips's business and has been designated confidential by Drips" and "feature putative class members' phone numbers," Dkt. 48 at 2.

Dkt. 49-41 (call log),[14] Dkt. 49-42 (text messages log);[15] Dkt. 49-43 (call log),[16] Dkt. 49-44 (text messages log),[17] and the NDNCR itself, *see* Dkt. 49-39 ¶ 9(III)(c)[18]—to demonstrate the major aspects of the Class Definition, specifically that the class members were a residential subscriber who received two or more calls within a twelve-month period from Drips for Liberty Mutual promoting the sale of Liberty Mutual's goods or services.[19] *Id.* at 25–26.[20]

Rather than respond to these arguments, Liberty Mutual contends that Ward cannot satisfy predominance because (1) the issue of Article III's injury-in-fact requirement necessitates an individualized assessment of whether each class member was contacted without consent; and (2) Ward himself has not demonstrated injury-in-fact because his actions illustrate that he initiated the contact with Liberty Mutual. Opp. at 23–26. Both arguments are unavailing.

"A federal court possesses Article III jurisdiction to hear a case or controversy only if [the case] alleges an injury in fact." *Aguasvivas v. Pompeo*, 984 F.3d 1047, 1052 (1st Cir. 2021) (citing *Susan B. Anthony List v. Driehaus* ("*SBA List*"), 573 U.S. 149, 157–58 (2014)). "An injury in fact must be 'concrete and particularized' and 'actual or imminent,' not 'conjectural' or

---

[14] *See supra* note 12.

[15] Dkt. 49-42 was filed under seal, *see* Dkt. 52 (granting motion to file exhibits under seal), because it "contain[s] certain proprietary details about Drips's business and has been designated confidential by Drips" and "feature putative class members' phone numbers," Dkt. 48 at 2.

[16] *See supra* note 13.

[17] Dkt. 49-44 was filed under seal, *see* Dkt. 52 (granting motion to file exhibits under seal), because it "contain[s] certain proprietary details about Drips's business and has been designated confidential by Drips" and "feature putative class members' phone numbers," Dkt. 48 at 2.

[18] Ward also points to Liberty Mutual's testimony as common evidence. *See* Mem. at 26.

[19] *See supra* note 7.

[20] Ward also contends that whether Liberty Mutual's actions with regards were willful or knowing with respect to both classes will "turns on the totality of [Liberty Mutual's] conduct," and thus not an individualized inquiry. Mem. at 28. Liberty Mutual does not appear to contest this position, *see generally* Opp., and the Court agrees with Ward.

'hypothetical.'" *O'Neil v. Canton Police Dep't*, 116 F.4th 25, 30–31 (1st Cir. 2024) (quoting *SBA List*, 573 U.S. at 158). In TCPA litigation, the receipt of "unsolicited telemarketing calls is a legally cognizable harm and comprises a 'concrete' injury," and thus "[a] plaintiff alleging a violation under the TCPA 'need not allege any additional harm beyond what Congress has identified.'" *Gibbs v. SolarCity Corp.*, 239 F. Supp. 3d 391, 395–96 (D. Mass. 2017) (quoting *Van Patten v. Vertical Fitness Group*, 847 F.3d 1037, 1043 (9th Cir. 2017)) (collecting cases that "held that a mere technical violation of the TCPA is, by itself, a concrete injury sufficient to confer standing"); *see also Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 653 (4th Cir. 2019) ("[T]he private right of action [in the TCPA] plainly satisfies the demands of Article III.").[21]

To the extent Liberty Mutual's argument is that class members' consent and Ward's consent both require an individualized determination, that argument also fails at this juncture.[22] While "[c]onsent is a complete defense under the TCPA," *Mantha*, 347 F.R.D. at 396, in this case, the threshold issue regarding consent turns on whether the use of the Liberty Mutual Website constitutes valid consent. *See, e.g.*, Reply at 11 ("Where Liberty [Mutual]'s consent defense for all class members originates from the same, consistent website[,] the legal sufficiency of the consent form can be adjudicated in one fell swoop."); *see also* Mem. at 26 ("Where all members

---

[21] Liberty Mutual argues—without citation—that "[t]he mere presence of a class member on a call sheet whilst being on the [NDNCR] does not mean they suffered a legal injury capable of redress." Opp. at 24. Yet courts have explicitly determined that such a technical violation does establish a legal injury as to confer standing. *See, e.g.*, *Gibbs*, 239 F. Supp. 3d at 395–96 (collecting cases). At the hearing, Liberty Mutual argued that any class members who consented to receiving calls had not suffered a legal injury and thus lacked standing. This argument fails, for reasons articulated in *Mantha*. *See* 347 F.R.D. at 397.

[22] The Court notes that "consent [is] an affirmative defense, which the caller has the burden to prove; lack of consent is not an element of the called party's claim." *Breda v. Cellco P'ship*, 934 F.3d 1, 4 n.4 (1st Cir. 2019). At oral argument, Liberty Mutual made numerous references to the fact that the Lead Website purportedly did list Liberty Mutual directly on the website. However, this fact is not properly in the record at this juncture. *See* Dkt. 67 (withdrawing motion for leave to supplement the record with this information). Nor does it undermine the conclusion that the Court can resolve a critical threshold question in this case—whether the Lead Website can be used to demonstrate consent—on a class-wide basis.

of a proposed TCPA class are alleged to have consented through the same or similar websites, whether the form(s) on said website is a valid means of obtaining consent for calls . . . and whether the leads constitute consent are common questions whose answers are apt to drive resolution of the case." (internal quotation marks omitted) (quoting *McCurley v. Royal Seas Cruises, Inc.*, 331 F.R.D. 142, 169 (S.D. Cal. 2019))) (collecting cases).

While Liberty Mutual also argues that variation in "the version of the webpage in effect at the time of submission" and changes in the "the marketing partner configuration" defeat commonality, Opp. at 17–18 (explaining that Liberty Mutual will rely on "proof [of consent] in the form of the Jornaya report for each class member"), such argument ignores the threshold question of this case: whether the form on the Lead Website could constitute consent at all,[23] *see* Mem. at 26. Ward's theory of his case is that the Lead Website cannot be used to demonstrate consent because Liberty Mutual is not listed on the website.[24] *See, e.g.*, Mem. at 26–28; Reply at 11–12. As another court in this District aptly explained:

---

[23] The Court also notes that Liberty Mutual has not presented any evidence that the website had any variation during the relevant time. *Cf.* Dkt. 49-27 at 3–4 (response to request for production of documents by Jornaya that it has no documents responsive to a request for "[a]ll documents which reflect any change to the [Lead W]ebsite . . . between March 1, 2020 and June 30, 2020"); Dkt. 61-1 (filed under seal) (deposition testimony from Liberty Mutual's expert that the consent form on the Lead Website was the same throughout the entire class period). The Court will not allow "arguments woven entirely out of gossamer strands of speculation and surmise to tip the decisional scales in a class certification ruling." *Waste Mgmt. Holdings*, 208 F.3d at 298 (citing *Zeigler v. Gibralter Life Ins. Co.*, 43 F.R.D. 169, 173 (D.S.D. 1967)); *see also id.* ("[W]hen the court supportably finds that an issue which, in theory, requires individualized factfinding is, in fact, highly unlikely to survive typical pretrial screening . . . , a concomitant finding that the issue neither renders the case unmanageable nor undermines the predominance of common issues generally will be in order.").

[24] Ward briefly suggests in his brief that "there are anomalies that call into question whether these leads were entirely fabricated by the lead generator." Mem. at 12. Ward reiterated this position during oral arguments. The Court is skeptical that such a theory of the case could be resolved on a class-wide basis. If the argument is that all leads were fabricated, that might be suspectable to class-wide resolution. But if the argument is that some portion of the leads were fabricated, that would seem to be an inherently individualized inquiry. That said, to the extent this argument is based on purported differences between the contend on the website and in Jornaya's reports, *see id.* at 12, the Court sees no reason to conclude from this difference that the leads were fabricated, *see* Dkt. 49-45 ¶ 6 (declaration of Jornaya representative explaining that the reports from Jornaya are "a virtual visual rendering of the actual lead creation event (not an actual visual recording), demonstrating the visitor's actions as they completed the lead creation form" rather than a capture of the website itself). Accordingly, on the current record, the Court does not believe this issue would be an individual inquiry which predominates over those common issues describe above.

> [E]ither (i) [Ward] is correct that the law requires [defendant] to be mentioned by name on the consent forms (thereby defeating [Liberty Mutual's] defense), or (ii) [Ward] is incorrect about this level of specificity (thereby allowing [Liberty Mutual] to demonstrate consent as it claims). Consent presents no other issues in this case as to the Class. In either scenario, [Liberty Mutual's] consent defense can be resolved through a single ruling.

*Mantha*, 347 F.R.D. at 397; *see also Thrower*, 2022 WL 3754737, at *5 (finding that "whether the forms themselves conveyed consent to be contacted for the purposes of the TCPA . . . can be adjudicated on a class-wide basis" where "all signs . . . point[ed] to general uniformity among consent forms on lead generator websites"). If the Lead Website is not a valid method by which Liberty Mutual could obtain consent, Liberty Mutual's arguments about the individualized inquiry of the consent defense become irrelevant. *Cf. Amgen*, 568 U.S. at 480–81 (rejecting defendant's attempt to litigate a defense as part of class certification and explaining that the defense related to "individual reliance questions will not overwhelm questions common to the class, for the class members' claims will have failed on their merits, thus bringing the litigation to a close").

Additionally, as explained above, that Ward contacted Liberty Mutual *after* receiving the challenged calls and texts does not evidence any consent to those calls and texts. *See supra* Section III.A.3 (citing *Clough*, 2019 WL 2527300, at *5 ("[T]hat [plaintiff] made misrepresentations when talking to . . . telemarketers after receiving the text message is not relevant to his contention that the defendants sent him the text message without his prior consent.")). Accordingly, the Court finds that Ward has made a sufficient showing that the central issues in this case are "common to the class and can be said to predominate." *Tyson Foods*, 577 U.S. at 453.

### 2.    Superiority

The superiority inquiry requires "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," and identifies several "matters pertinent" for the court to consider.  Fed. R. Civ. P. 23(b)(3).  These are:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Id.*  "Rule 23 has to be read to authorize class action in some set of cases where seriatim litigation would promise such modest recoveries as to be economically impracticable."  *Gintis v. Bouchard Transp. Co., Inc.*, 596 F.3d 64, 66–67 (1st Cir. 2010).

Liberty Mutual argues that a class action is not superior in this case because it "would devolve into a series of mini-trials" regarding consent.  Opp. at 27.  But as discussed above, if the Lead Website does not satisfy the TCPA's consent requirement, no such "mini-trials" will be necessary.  *See supra* Section III.A.2; Section III.B.1.  Further, given the minimal damages at issue for each putative class member,[25] separate actions would be impractical.  *See Gintis*, 596 F.3d at 68 (noting that "there is a real question whether the putative class members could sensibly litigate on their own for these amounts of damages"); *Mantha*, 347 F.R.D. at 399 (finding a class action superior where "potential statutory recovery is relatively low" for individual claimants and "resolving claims in a single forum would also provide 'flexibility, control, and consistency that would not exist with individual litigation'" (citations omitted)); *see also Bee, Denning, Inc. v. Cap. All. Grp.*, 310 F.R.D. 614, 630 (S.D. Cal. 2015) ("A statute such as the TCPA, which provides for

---

[25] The TCPA allows claimants to recover up to $500 for each violation, or $1,500 for each willful violation. *See* 47 U.S.C. § 227(c)(5).

16

a relatively small recovery for individual violations but is designed to deter conduct directed against a large number of individuals, can be effectively enforced only if consumers have available a mechanism that makes it economically feasible to bring their claims."). Thus, considering the Rule 23(b)(3) factors, the Court finds that Ward has sufficiently shown that a class action is a superior method for resolving the instant controversy.[26]

## IV.   Conclusion

For the foregoing reasons, Ward's motion to certify the class is GRANTED.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Dated: June 12, 2026                    Judge, United States District Court

---

[26] "To the extent individualized inquiries might arise, the Court can either handle such issues in the context of classwide proceedings or, if necessary, revisit certification." *Bee, Denning*, 310 F.R.D. at 630.