UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ADAM WARD**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**LIBERTY MUTUAL INSURANCE COMPANY,**<br><br>**Defendant.** | **Civil Action No. 24-10526-BEM** |

**MEMORANDUM AND ORDER ON**
**PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**MURPHY, J.**

This is a class action in which Plaintiff Adam Ward ("Ward"), individually and on behalf of all others similarly situated, alleges that Defendant Liberty Mutual Insurance Company ("Liberty Mutual") sent telemarketing messages to class members in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* (the "TCPA"). Before the Court now are the parties' cross-motions for summary judgment. For the reasons set forth below, the Court will deny both motions for summary judgment.

## I. Background

### A. The Telephone Consumer Protection Act

The TCPA prohibits the transmission of any call using a pre-recorded voice ("PRV") to a cellular or residential telephone number without the "prior express consent" of the called party. 47 U.S.C. § 227(b)(1)(A)–(B). For pre-recorded telemarketing calls to a cell phone or landline, such consent must be "written." 47 C.F.R. § 64.1200(a)(2). The TCPA also prohibits telephone solicitations, including calls and text messages, to an individual "who has registered his or her

telephone number on the national do-not-call registry [("NDNCR")]." *Id.* § 64.1200(c), (e); *see* 47 U.S.C. § 227(c)(5).

## B. Factual Background

Except as noted, the following facts are undisputed. Liberty Mutual is a nationwide insurance company that utilizes telemarketing to promote its products. Dkt. 112 at 1, ¶ 1.[1] To identify prospects for telemarketing calls, Liberty Mutual purchases "leads" from third-party lead aggregators, who collect leads from other sub-vendors and lead generators. *Id.* at 2, ¶ 7. Between March 17, 2020, and June 12, 2020, Liberty Mutual purchased 24,587 leads from All Web Leads, Inc. (AWLI). *Id.* at 2, ¶ 10. AWLI had an agreement with Next Level Media to procure leads, *id.* at 2, ¶ 11, but the parties dispute whether Liberty Mutual can trace its leads back to Next Level Media, *id.* at 9–10, ¶¶ 19, 21.

In October 2018, Liberty entered into an agreement with its dialing vendor, Drips Holdings, LLC ("Drips"), and used Drips's dialing platform between March 17, 2020, and June 2, 2020, to place 125,820 calls to 20,254 PRV class members' cell phones and play a pre-recorded message.[2]

---

[1] Unless otherwise indicated, citations to Dkt. 112 ("Parties' Combined Material Facts and Responses Thereto") refer to the facts as admitted or substantially agreed upon by the parties. Dkt. 112 contains separate paragraph numbering for stipulated facts, Dkt. 112 at 1–3, Plaintiff's statement of material facts and Defendant's response, *id.* at 3–18, Defendant's statement of material facts and Plaintiff's response, *id.* at 18–50, and Plaintiff's statement of additional material facts and Defendant's response, *id.* at 51–54. To distinguish between material facts with the same numbering in each of these sections, the Court will cite both the pages and paragraph numbers of Dkt. 112 that the facts appear on.

[2] The PRV class consists of "[a]ll persons in the United States or its territories (1) to whom Liberty Mutual placed, or caused to be placed, one or more call; (2) between March 1, 2020 to June 30, 2020; (3) to a number assigned to a cellular telephone service; (4) where Drips'[s] records indicate a prerecorded message played; and (5) the person's phone number appears on the AWLI Spreadsheet." Dkt. 70 at 4 (alterations in original).

*Id*. at 2–3, ¶¶ 13–14. During the same time period, Liberty Mutual made or sent 56,517 calls and text messages to 7,092 members of the National Do Not Call ("NDNC") class.[3] *Id*. at 3, ¶ 15.

Each lead sold by AWLI to Liberty Mutual included a "Lead ID Token" associated with the third-party platform Verisk, Inc. d/b/a/ Jornaya ("Jornaya"). *Id.* at 2, ¶ 12. Jornaya generates a TCPA compliance report and a "Visual Playback," which purports to be a "virtual visual rendering of the actual lead creation event" that includes "the substance of consent disclosures," but is "not an actual visual recording." *Id.* at 12–13, ¶ 27; *see id.* at 34, ¶ 26.

The parties disagree about whether Jornaya's Visual Playback and compliance report, in conjunction with other information produced by Liberty Mutual, constitute express written consent obtained from contacted class members.[4] *Id.* at 8–10, ¶¶ 17–19. In particular, the parties dispute whether the Jornaya data identifies the URL of the webpage where consent events are alleged to have occurred, *id.* at 10–12, ¶¶ 20, 25; whether the URL at which Liberty Mutual claims consent events took place was cancelled and inactive during March 1, 2020 through June 30, 2020, *id.* at 13, ¶ 29; and whether the produced archive page of that website from archive.org ("Internet Archive") "shows a materially different webpage" than the Visual Playback, *id.* at 14, ¶¶ 32–33. Ward also highlights discrepancies between the data fields on consent forms visible in the Internet Archive, visible in the Visual Playback, and actually present in the ultimate lead data provided to Liberty Mutual by AWLI. *Id.* at 15–16, ¶¶ 34–38; *see* Dkt. 96-30.

---

[3] The NDNC class consists of "[a]ll persons in the United States or its territories who (1) received more than one call in a 12-month period; (2) by or on behalf of Liberty Mutual; (3) on a telephone number that appeared on the National Do Not Call Registry for at least 31 days at the time of the calls, (4) between March 1, 2020 and June 30, 2020; and (5) the person's phone number appears on the AWLI Spreadsheet." Dkt. 70 at 4 (alteration in original).

[4] Liberty Mutual notes that the "Jornaya Report reflects that Plaintiff *or someone else* affirmatively clicked 'Submit' after being presented with clear and conspicuous TCPA disclosure language." Dkt. 112 at 41, ¶ 38 (emphasis added). Ward disputes that statement to note that a "bot" may also "enter information into a website and obtain a valid Jornaya LeadID." *Id.* at 41–42, ¶ 38; *see also* 96-25, ¶¶ 25–26. In any case, the parties agree at least that the Jornaya data alone cannot verify that the user entering an individual's information into a consent form on a webpage is that individual themselves.

The parties agree that the consent form purportedly verified by Jornaya informs users that "by clicking 'submit,'" they are providing "prior express written consent to receive marketing communications regarding insurance products and services . . . from Instant-Auto-Insurance-now.com and *one or more of its marketing partners*." Dkt. 112 at 13, ¶ 28 (citation modified). However, Liberty Mutual's contention that "the consent provision clicked on by visitors . . . included an image of Liberty as well as other insurers" is disputed, and the parties disagree about whether Liberty Mutual was displayed as a marketing partner on a webpage that users visited. *Id.* at 38–39, ¶¶ 35–36. The Internet Archive, but not the Visual Playback, displays an image of Liberty Mutual's logo and name below the fields in the consent form. Dkt. 95-12 at 10; Dkt. 96-7. In short, the parties dispute the existence of consent, the type of consent, and the details included in any purported consent. Further, the parties dispute the contents of Liberty Mutual's policies and procedures governing telephone and text communications with consumers. Dkt. 112 at 26–29, ¶¶ 20–22.

### C. <u>Procedural Background</u>

On March 1, 2024, Ward filed his complaint alleging that Liberty Mutual violated the TCPA by placing calls and sending text messages to residential telephone numbers in a manner that violated 47 U.S.C. §§ 227(b)(1) and 227(c)(5), and the TCPA's corresponding regulations. *See generally* Dkt. 1. On June 12, 2026, this Court granted Ward's motion for class certification, and certified two classes of similarly situated telemarketing recipients pursuant to Rule 23 of the Federal Rules of Civil Procedure. *See generally* Dkt. 70. On July 31, 2026, Ward and Liberty Mutual filed cross-motions for summary judgment. Dkts. 89, 92–94.

## II. <u>Legal Standard</u>

Summary judgment will only be granted where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Grogan v. All My Sons Bus. Dev. LLC*, 552 F. Supp. 3d 142, 145 (D. Mass. 2021) (quoting Fed. R. Civ. P. 56(a)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "To succeed [on a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Grogan*, 552 F. Supp. 3d at 145 (quoting *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990)).

The Court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). However, "[t]he nonmoving party cannot fend off summary judgment unless it makes a competent demonstration that every essential element of its claim or defense is at least trialworthy." *Price v. Gen. Motors Corp.*, 931 F.2d 162, 164 (1st Cir. 1991) (emphasis omitted). "Where the non-moving party bears the ultimate burden of proof, the non-moving party 'must present definite, competent evidence to rebut the motion.'" *Satanic Temple, Inc. v. City of Bos.*, 684 F. Supp. 3d 21, 30 (D. Mass. 2023) (quoting *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991)), *aff'd*, 111 F.4th 156 (1st Cir. 2024).

## III. Discussion

The parties' cross-motions for summary judgment concern Liberty Mutual's affirmative defenses. Liberty Mutual concedes that the elements of TCPA liability under 47 U.S.C. §§ 227(b)(1) and 227(c)(5) are satisfied. Dkt. 103 at 8. Liberty Mutual relies on two affirmative defenses to argue that it cannot be held liable: (1) class members provided express consent to be contacted and (2) Liberty Mutual's compliance procedures are sufficient to prevent liability under

a statutory safe harbor provision of the TCPA. *Id.*; Dkt. 94 at 5. The Court addresses each affirmative defense in turn.

**A. <u>Consent</u>**

"Consent is a complete defense under the TCPA." *Mantha v. QuoteWizard.com, LLC*, 347 F.R.D. 376, 396 (D. Mass. 2024); *see* 47 U.S.C. § 227(b)(1)(A). "The defendant bears the burden of proof to establish that the consumer consented." *Gaker v. Citizens Disability, LLC*, 654 F. Supp. 3d 66, 72 (D. Mass. 2023).

Ward argues that Liberty Mutual has no admissible evidence of consent to sustain its defense, because Liberty Mutual cannot prove "(i) who created the consumer 'leads' it purchased from its vendor; (ii) how those leads were acquired by its vendor; (iii) whether the leads actually originated from a website (if any), what the site actually looked like and whether it was even active; (iv) how its vendor acquired certain information not on any data form; and (v) whether any class member visited the website Liberty's vendor claims they did." Dkt. 92 at 6 (emphasis omitted). By contrast, Liberty Mutual argues that "undisputed contemporaneous electronic records" satisfy its burden to prove consent, entitling it to summary judgment. Dkt. 94 at 7. At this juncture, neither party is entitled to summary judgment because the existence, appearance, and operation of the website or websites where class members may have consented to contact is in dispute. *See Miranda-Rivera v. Toledo-Dávila*, 813 F.3d 64, 69 (1st Cir. 2016) ("A 'genuine' dispute exists when a jury can reasonably interpret the evidence in the non-movant's favor.").

**1. <u>Consideration of Consent Evidence</u>**

Ward challenges the admissibility of Liberty Mutual's consent evidence, arguing that Liberty Mutual presents no evidence on where its "lead data *actually came from*." Dkt. 92 at 15 (emphasis in original); *see* Dkt. 105 at 7–13. Because Liberty Mutual has "offered no testimony" from the registrant or owner of the website it claims leads were generated from, Ward claims that

Liberty Mutual cannot "lay a proper foundation under Fed. R. Evid. 601 or Fed. R. Evid. 602." Dkt. 92 at 15–16. Further, Ward claims that Jornaya's Visual Playback data, which purports to be a visual rendering of each lead-creation event, "is an improper use of a simulation" because it is materially different than the actual event. *Id.* at 18–19. Ward points to Liberty Mutual's "conflicting position" on the website's appearance, and various visual and textual discrepancies between the Internet Archive and on the Visual Playback to argue that the Visual Playback is "unreliable and inadmissible." *Id.* at 19. One of Ward's exhibits demonstrates these discrepancies:

| Internet Archive Data Entry Form (Pltf. Exhibit 1-S) | Jornaya Data Entry Form (Pltf. Exhibit 1-F) |
| --- | --- |
|   |   |

Dkt. 96-30 at 2 (comparing the Internet Archive and the Visual Playback).

Ward overstates the requirements for consideration of evidence at this stage. The "standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it *could* be presented at trial in admissible form." *Est. of Rahim by Rahim v. Doe*, 51 F.4th 402, 412 (1st Cir. 2022) (emphasis in original) (quoting *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012)). Jornaya's data is collected in its ordinary course of business. A sworn

declaration from Jornaya's technical co-founder details how Jornaya's script works to assign a unique Lead ID, generate a TCPA compliance report, and generate a Visual Playback when a user interacts with a consent form on a website. *See generally* Dkt. 96-25. The Federal Rules of Evidence permit the admission of records "kept in the course of a regularly conducted activity of a business" if the testimony of a "qualified witness" can show all certain relevant conditions are met. Fed. R. Evid. 803(6). "[A] 'qualified witness' under Rule 803(6) . . . . is simply one who can explain and be cross-examined concerning the manner in which the records are made and kept." *Sec. & Exch. Comm'n v. Gasarch*, 168 F.4th 11, 30 (1st Cir. 2026) (quoting *U.S. Bank Tr., N.A. as Tr. For LSF9 Master Participation v. Jones*, 925 F.3d 534, 538 (1st Cir. 2019). Liberty Mutual could likely present witnesses at trial to authenticate, explain, and lay the foundation for Jornaya's business records.[5]

Ward's doubts about whether the URL of the purported consent form was active, Dkt. 112 at 13, ¶ 29, and potential discrepancies between different depictions of that URL do not render Liberty Mutual's consent evidence inadmissible. While Liberty Mutual does not have any testimony from the operator of the website where the consent event allegedly occurred, the disclosure message displayed to users according to Jornaya's TCPA compliance report and Visual Playback contains a URL, and multiple declarations submitted by Liberty Mutual state that Jornaya stored a source URL for the Lead ID associated with Ward. *See* Dkt. 103-2 ¶¶ 3–6; Dkt. 103-3 ¶¶ 7–18. A screenshot of the Internet Archive of the URL, which Liberty Mutual submitted

[5] Ward objects to the Visual Playback, in particular, as an impermissible simulation because of what it claims are shifting statements from Liberty Mutual regarding which elements of the website the Visual Playback depicts accurately. *See* Dkt. 92 at 13–14; Dkt. 111 at 5, 8–9. Liberty Mutual claims the "Visual Playback is a virtual visual rendering of the actual lead creation event (not an actual visual recording)." Dkt. 96-25 ¶ 6. The Court considers the Visual Playback evidence at summary judgment because the record suggests that "the visitor's interaction with the field as well as information about the field" is "collect[ed]," rather than simulated. *Id.* at ¶ 6; *see also id.* ¶¶ 24–25. Even if other elements of the Visual Playback are simulated, that information, which is pertinent to the question of consent, is sufficient to raise a dispute of fact at this stage.

along with an affidavit from a records request processor at archive.org, shows an image of the website taken during this time period. Dkt. 95-12; *see Universal Church, Inc. v. Universal Life Church/ULC Monastery*, 2017 WL 3669625, at *3 n.7 (S.D.N.Y. Aug. 8, 2017), *aff'd sub nom.*, *Universal Church, Inc. v. Toellner*, 752 F. App'x 67 (2d Cir. 2018) (noting that screenshots and an affidavit from an archive.org employee are sufficient for authentication purposes).

The evidence from Jornaya could be presented in admissible form at trial and is sufficient to raise a dispute of fact as to consent. In the cases Ward cites where courts have ruled that evidence was not admissible to demonstrate consent, defendants did not claim to have contemporaneously created business records verifying each consent event, as Liberty Mutual does here. *See Hossfeld v. Allstate Ins. Co.*, 726 F. Supp. 3d 852, 873 (N.D. Ill. 2024), *rev'd on other grounds*, 179 F.4th 1046 (7th Cir. 2026) ("[Defendant] has not laid an evidentiary predicate tracing the hearsay statements in the [leads] spreadsheet to their source, *i.e.*, the data and statements that underly them."); *Fed. Trade Comm'n v. Day Pacer LLC*, 689 F. Supp. 3d 609, 639 (N.D. Ill. 2023) ("The record does not contain screenshots or other contemporaneous evidence to establish the contents of the websites on which the customers supposedly provided express written consent."), *aff'd in part, rev'd in part and remanded*, 125 F.4th 791 (7th Cir. 2025).

None of this means that the evidence on the record is sufficient to conclusively establish consent and entitle Liberty Mutual to summary judgment. As Ward notes, there may be cause to doubt Liberty Mutual's records of the alleged consent events, including discrepancies between different sources regarding the fields of information on consent forms, conflicting accounts of whether the website where consent events took place was active, and visual differences between the Visual Playback Page and the Internet Archive that may or may not be explained by redirecting between webpages. *See* Dkt. 92 at 15–17; Dkt. 105 at 7–9. Further, Ward himself disputes that

he visited the website, *see* Dkt. 103 at 13 n.4, and Liberty Mutual also concedes that its contemporaneous record of consent events cannot detect bots or verify if a person's information was entered without consent by someone else, *see* Dkt. 96-25 ¶ 27.

**2. Sufficiency of the Consent Form**

Ward argues that, even if Liberty Mutual's consent evidence may be considered, this evidence is insufficient to prove consent because the terms displayed in the consent agreement do not constitute "prior express consent" that is "evidenced by a signed, written agreement *between the consumer and the seller*." Dkt. 92 at 19–22 (emphasis in original) (quoting *Mantha v. Quotewizard.com, LLC*, 2021 WL 6061919, at *8 (D. Mass. Dec. 3, 2021), *report and recommendation adopted*, 2022 WL 325722 (D. Mass. Feb. 3, 2022)). The disclosure agreement identified by Jornaya permits users to "give prior express written consent to receive marketing communications regarding insurance products and services via automatic telephone dialing system and/or pre-recorded calls and/or sms/mms from Instant-Auto-Insurance-now.com and *one or more of it's marketing partners*," Dkt. 112 at 13, ¶ 28 (citation modified), which Ward argues does not grant consent to contact by Liberty Mutual, specifically, Dkt. 92 at 15–16.

Again, the ambiguity over the appearance of the website, and particularly over whether users would have seen Liberty Mutual's name and logo on it, precludes summary judgment. Because the screenshot on the Internet Archive page displays Liberty Mutual's name and logo, a reasonable factfinder could conclude that the form depicts Liberty Mutual as a marketing partner.[6]

[6] As Liberty Mutual notes, at least one case holds that consumers need not consent to calls on a "one-to-one" basis, and that consent forms can authorize contact by multiple entities at once. *Ins. Mktg. Coal. Ltd. v. Fed. Commc'ns Comm'n*, 127 F.4th 303, 314 (11th Cir. 2025). The Court need not resolve this dispute regarding how specific to a defendant the consent allegedly given must be, because there is a dispute of fact regarding whether an individual would have seen Liberty Mutual's name and logo on a webpage prior to providing consent.

Ward's comparison to *Mantha* is inapposite because in that case, the consent form "[did] not mention defendant or its clients by name" and "no reasonable jury would credit defendant's claim to be a 'marketing partner.'" *Mantha*, 2021 WL 6061919, at *8–9. In *Mantha*, the defendant did "not have a contract with the company (AutoInsurQuotes.com) named in the consent form" and "had never heard of the company." *Id.* Here, Liberty Mutual has a contract with AWLI, and presents a declaration from the director of online operations at AWLI stating that the leads sold to Liberty Mutual, which were compiled from AWLI's business records into a spreadsheet, were purchased from Next Level Media. Dkt. 103-4 ¶¶ 2–5; *see also* Dkt. 87-4; Dkt. 87-5.[7] The connection between these leads and the URL purportedly responsible for collecting them is disputed, Dkt. 104 at 7, ¶ 20, but that dispute and the possibility that individuals saw a page with the Liberty Mutual logo and name on it prior to providing consent makes it possible for a reasonable jury to find that Liberty Mutual can explain the connection or chain of connections between itself and the website where consent events allegedly took place.

It is similarly inappropriate to grant summary judgment at this stage based on Ward's argument that the alleged consent agreement was an impermissible "browsewrap" agreement. Dkt. 92 at 20–21; Dkt. 111 at 11–12.[8] Given the dispute over which pages the users allegedly providing consent actually saw, it cannot be concluded at this stage that the agreement was "browsewrap." If Liberty Mutual were listed as a "marketing partner" on another hyperlinked webpage, the Court

---

[7] Dkt. 103-4 was filed under seal, *see* Dkt. 106 (granting motion to file exhibit under seal), because it "contains potentially 'confidential' information and proprietary information," Dkt. 102 at 1. Dkt. 87-4 and Dkt. 87-5 were also filed under seal, *see* Dkt. 97 (granting motion to file exhibit under seal), because Dkt. 87-4 "includes personal identifying information associated with consumers and was designated confidential by AWLI" and Dkt. 87-5 "includes confidential and proprietary business information and has been designated confidential by third-party AWLI," Dkt. 86 at 2.

[8] "[A] browsewrap agreement attempts to bind a user to terms simply because they appear on a page the user visited, with no further showing that the user read or agreed to the terms." *Gaker*, 654 F. Supp. 3d at 73.

would still need to engage in an "ultimate totality-of-the-circumstances inquiry . . . allowing courts to draw parallels between similarly categorized online agreements" to determine whether consent was given. *Gaker*, 654 F. Supp. 3d at 75. The Court cannot undertake that inquiry given the factual dispute over the totality of the circumstances. For the same reason, Ward is also not entitled to summary judgment on the grounds that Liberty is not a "third-party beneficiary" to the contract, Dkt. 92 at 21, because the determination of beneficiaries under the contract may turn on what users actually saw.

### B. TCPA Safe Harbor

Finally, Liberty Mutual argues that it is entitled to summary judgment because its compliance procedures are an affirmative defense to liability under a "safe harbor" provision of the TCPA. Dkt. 94 at 18–24. The TCPA states that "[i]t shall be an affirmative defense in any action brought under this paragraph that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5).[9] An entity can assert this affirmative defense by demonstrating that "the violation is the result of error and that as part of its routine business practice," it meets specified "standards." 47 C.F.R. § 64.1200(c)(2)(i).

To qualify for the safe harbor, the "person or entity making telephone solicitations" must, "as part of its routine business practice": (1) have "established and implemented written procedures to comply with the national do-not-call rules;" (2) have "trained its personnel, and any entity assisting in its compliance, in procedures established pursuant to the national do-not-call rules;" (3) have "maintained and recorded a list of telephone numbers that the seller may not contact;"

[9] Because 47 U.S.C. § 227(c)(5) establishes this affirmative defense only as to an "action brought under this paragraph," the defense would apply only to the § 227(c)(5) claim, and not the § 227(b)(1) claim.

(4) use "a process to prevent telephone solicitations to any telephone number on any list established pursuant to the do-not-call rules"; and (5) use "a process to ensure that it does not sell, rent, lease, purchase or use the national do-not-call database, or any part thereof, for any purpose except compliance with this section and any such state or federal law to prevent telephone solicitations to telephone numbers registered on the national database." *Id.* § 64.1200(c)(2)(i)(A)–(E).

Liberty Mutal argues both that contacts with class members were made in error and that its compliance program meets the required criteria for the safe harbor. Dkt. 94 at 18–24. Liberty Mutual characterizes its compliance program as including the maintenance of a multi-tiered do-not-call list and guidelines to ensure those listed are not contacted, contracts with Jornaya to ensure TCPA compliance, and a requirement that TCPA disclosures in consent forms be reviewed and approved. *Id.* at 19–21. Liberty Mutual relies on a declaration by a senior Liberty Mutual employee ("Hemker Declaration"), *see generally* Dkt. 95-1, as well as a document entitled "Customer Complaint Handling Policy and Procedures," Dkt. 95-10 at 1, to describe its compliance program.[10] Ward argues that the Hemker Declaration's "generalized assertions do[] not establish the contents or *implementation* of the particular procedures required for the regulatory safe harbor," and that several prongs of the affirmative defense are not met. Dkt. 105 at 20–24 (emphasis in original).[11]

The Hemker declaration and the "Customer Complaint Handling Policy and Procedures" are insufficient to establish that Liberty Mutual's compliance practices qualify it for the "safe

---

[10] Dkt. 95-1 and Dkt. 95-10 were filed under seal, *see* Dkt. 98 (granting motion to file exhibits under seal), because they "contain potential 'confidential' information and other proprietary information," Dkt. 90 at 1–2.

[11] Ward also objects to Liberty Mutual's failure to produce the full contents of Dkt. 95-10 and the policies referenced in the Hemker Declaration during discovery. *See* Dkt. 105 at 19–20. Finding that the evidence in the record is insufficient to entitle Liberty Mutual to summary judgment based on the safe harbor even if considered, the Court does not address this argument.

harbor" at the summary judgment stage. While Liberty Mutual claims that it "maintains written policies and procedures governing telephone and text communications," Dkt. 112 at 28, ¶ 21, only one of those written policies is provided, describing the process for removing an individual from Liberty Mutual's call, email, and mailing lists upon request, *see* Dkt. 95-10 at 11–15. That policy does not address "requirements for obtaining consumer consent prior to making marketing calls or sending marketing messages," "restrictions on the use of automated dialing systems," or "recordkeeping and documentation practices relating to consumer consent" as Liberty Mutual claims its policies do. Dkt. 112 at 28, ¶ 21.

Further, the safe harbor defense requires that Liberty Mutual "train[] its personnel, and any entity assisting in its compliance, in procedures established pursuant to the national do-not-call rules." 47 C.F.R. § 64.1200(c)(2)(i)(B). The Hemker declaration offers only a cursory and general mention of training, *see* Dkt. 95-1 ¶¶ 35, 39, and while Liberty Mutual claims in its statement of facts that "policies are communicated to relevant employees through internal manuals, guidance, and regular training," Dkt. 112 at 29, ¶ 22, the Hemker declaration does not say this specifically, nor are these manuals and guidance materials in the record. The safe harbor defense also requires Liberty Mutual to train "any entity assisting in its compliance." 47 C.F.R. § 64.1200(c)(2)(i)(B). While Liberty Mutual describes its relationship with Jornaya, Dkt. 94 at 20–21, it does not describe how its training or its "policy applies to all of its own employees, the employees of any subsidiary companies and any company with whom [it] contracts," *Van Elzen v. Am. Home Shield Corp.*, 2026 WL 1078771, at *10 (E.D. Wis. Apr. 21, 2026) (granting summary judgment based on safe

harbor defense). Therefore, Liberty Mutual is not entitled to summary judgment on its safe harbor defense.[12]

In support of his motion for summary judgment, Ward argues that "Liberty has failed to marshal evidence to support this disfavored defense." Dkt. 92 at 23. However, the Hemker declaration suggests that evidence pertaining to the elements of the safe harbor defense could be presented in admissible form at trial. Ward also argues, citing *Mantha*, that "[c]ourts within the First Circuit have been reluctant to deny 227(c) liability on the basis of the good faith safe harbor," Dkt. 92 at 22, but *Mantha* did not address the specific affirmative defense in § 64.1200(c)(2)(i) asserted here, *Mantha*, 2021 WL 6061919, at *9. Because there remains a dispute of fact regarding the contents of Liberty Mutual's policies and procedures, *see* Dkt. 112 at 28–29, ¶¶ 21–22, and whether contacts with class members were made erroneously, the Court will refrain from granting summary judgment to either party on this defense.

## IV. Conclusion

For the foregoing reasons, the parties' cross-motions for summary judgment are DENIED.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Judge, United States District Court

Dated: October 1, 2026

[12] To successfully assert this defense, Ward would also have to prove that the calls were made in "error," 47 C.F.R. § 64.1200(c)(2)(i), which turns in part on whether Liberty Mutual could reasonably assume that it had obtained consent from class members. As set forth above, *see supra* Section III.A, disputed facts prevent the Court from determining the existence of consent, and these disputes similarly prevent determination of whether consent could reasonably be assumed by Liberty Mutual.